UNITED STATES  BANKRUPTCY  COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

In re:

FAMILY CHRISTIAN, LLC, *et al.*,[1]

        Debtors.

_____ /

UNITED METHODIST PUBLISHING
HOUSE INC., *et al*.,

        Plaintiffs,

v.

FAMILY CHRISTIAN, LLC, *et al*.,

        Defendants.

_____ /

Case No. GG 15-00643-jtg
(Jointly Administered)

Chapter 11

Hon. John T. Gregg

Adv. Proc. No. 15-80062

## MEMORANDUM DECISION REGARDING MOTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO INTERVENE

This matter comes before the court in connection with a motion to intervene [Adv. Dkt. No. 30] (the "Motion to Intervene") filed by the Official Committee of Unsecured Creditors (the "Committee") in the above-captioned adversary proceeding.  The Committee seeks to intervene as a defendant to determine, among other things, whether certain goods with a value of approximately $20 million constitute property of the estate, or whether such goods remain property of certain vendors (collectively, the "Plaintiffs"), all of whom allegedly sold goods to the Debtors (as defined below) on consignment.  For the following reasons, the court shall deny the Motion to Intervene.

---

[1]      The Debtors in these jointly administered cases are Family Christian, LLC (Case No. 15-00643-jtg), Family Christian Holding, LLC (Case No. 15-00642-jtg), and FCS Giftco, LLC (Case No. 15-00644-jtg).

## JURISDICTION

The court has jurisdiction pursuant to 28 U.S.C. §§1334(b) and 157(b).  This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (K) and (O).

## BACKGROUND

Headquartered in Grand Rapids, Michigan, Family Christian, LLC (the "Operating Debtor") and its debtor-affiliates, Family Christian Holding, LLC and FCS Giftco, LLC (together with the Operating Debtor, the "Debtors"),[2] sell Christian religious merchandise such as books, music, movies and other supplies at more than 250 brick and mortar retail stores located throughout 36 states.  As of the petition date, the Debtors maintained a labor force of approximately 3,100 employees.

The Debtors' beginnings can be traced to Zondervan Stores, which was established sometime in the 1930s.  In the 1990s, Zondervan Stores changed its name to Family Christian Stores.  Family Christian Stores was acquired by the Debtors' current ownership in 2012.  The Debtors operate as non-profit organizations whose collective mission is to donate their profits to the Non-Debtor Parent for charitable purposes such as disseminating bibles, supporting orphans and others in need, funding mission trips, and orchestrating relief efforts.  However, due to their financial difficulties, since 2012 the Debtors have remitted only approximately $300,000 to the Non-Debtor Parent for charitable purposes.

According to the Debtors, their financial problems relate to various factors, including changing market conditions and the debt load placed upon the Debtors as a result of the 2012 sale

---

[2]     The Operating Debtor is wholly-owned by Family Christian Holding, LLC, which in turn is wholly owned by a non-debtor parent company, Family Christian Resource Centers, Inc. (the "Non-Debtor Parent").  FCS Giftco, LLC is a non-operational entity wholly owned by the Operating Debtor.  The Non-Debtor Parent, who ultimately owns the Debtors, is controlled by Richard Jackson, a businessman from Atlanta, Georgia, with various other business ventures.

transaction. In 2012, the Debtors obtained a revolving line of credit from JPMorgan Chase. In return, the Operating Debtor granted to JPMorgan Chase an alleged first priority security interest in certain of its assets, and a subordinated security interest on the remainder of its assets. The sale transaction in 2012 was also financed by a term loan from certain third party lenders (the "Term Lenders") for which Credit Suisse AG, Cayman Islands Branch ("Credit Suisse") acts as agent. As security for repayment of the term loan, the Debtors granted the Term Lenders an alleged first priority security interest in those assets in which JPMorgan Chase allegedly held a subordinated security interest, and a subordinated security interest in those assets subject to the alleged first priority security interest of JPMorgan Chase.

In 2014 the Debtors apparently began to suffer liquidity problems and were unable to satisfy certain obligations to JPMorgan Chase.[3] In order to allow for continued borrowings under the revolving line of credit, Richard Jackson, through his entity Jackson Investment Group, LLC, allegedly paid $7 million to JPMorgan Chase to ensure continued extensions of credit to the Debtors under the revolver. Thereafter, FC Special Funding, LLC ("FC Special Funding", and together with the Term Lenders, the "Lenders"), an entity allegedly controlled by Richard Jackson, was created for the purpose of purchasing JPMorgan Chase's position. FC Special Funding, through a servicer, now loans funds to the Debtors through the revolving line of credit.

On February 11, 2015, the Debtors each filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. The United States Trustee (the "UST") appointed the Committee on

---

[3]    As of the petition date, the Debtors estimated that they owed approximately $24 million to FC Special Funding on the revolver, approximately $34 million to the Term Lenders, and approximately $40 million to trade vendors.

February 23, 2015 [Dkt. No. 158]. The Committee is comprised of various unsecured creditors, four of whom are now Plaintiffs in this adversary proceeding.[4]

One day after filing their petitions, the Debtors filed a motion seeking to sell substantially all of their assets [Dkt. No. 30] to a proposed stalking horse bidder, FCS Acquisition, LLC, which is not only affiliated with the Non-Debtor Parent, but is also controlled by Richard Jackson. The initial sale motion proposed to sell all of the Debtors' inventory, including inventory allegedly subject to consignment arrangements with the Plaintiffs and other vendors. As of the petition date, the consignment inventory was alleged to be worth approximately $20 million. After numerous creditors and other parties in interest objected to the proposed sale due to, among other things, its insider nature, the Debtors withdrew their sale motion.

Seemingly as a countermeasure to the initial sale motion, the Plaintiffs commenced this adversary proceeding. The complaint, which, to date, has been amended several times, seeks (i) a declaration that the inventory was sold by the Plaintiffs to the Debtors pursuant to consignment agreements and is not property of the Debtors' estates, (ii) an injunction prohibiting the Debtors from selling the alleged consigned goods, and (iii) turnover of the alleged consigned goods to the Plaintiffs, including relief from the automatic stay, to the extent necessary.

Several weeks after the initial sale motion was withdrawn, the Debtors filed a second motion seeking to sell substantially all of their assets [Dkt. No. 487]. The second sale motion does not propose to sell the assets to a stalking horse bidder; rather, the Debtors proposed to

---

[4]     Because Capital Christian Music Group, Dayspring Cards, Provident Distribution and Word Entertainment are Plaintiffs in this adversary proceeding and also serve on the Committee, these Plaintiffs would, in effect, be suing the very Committee upon which they sit in the event that this court granted the Motion to Intervene. The court previously questioned counsel for the Committee regarding the diverging interests of the Committee and the self-interests of its members. Counsel for the Committee explained to the court that the Committee had adopted internal measures to address the conflict and indicated that proactive steps would be taken by the Committee, in concert with the UST, in the event that the conflict became untenable. The UST, as well as numerous other parties, have been apprised of the conflict and are seemingly satisfied that the Committee need not be reconstituted at this point in time, as no request has been made to this court or, upon information and belief, to the UST. *See* 11 U.S.C. § 1102(a)(4).

expeditiously and aggressively market their assets through an investment banker in order to identify potential bidders.  Although this second sale motion drew numerous objections, the bidding procedures component was, in large part, supported by the Committee, the Lenders and other parties, including the Plaintiffs, after certain revisions were made.  The court approved these bidding procedures on April 16, 2015 [Dkt. No. 597].  Notwithstanding the consensual nature of the bidding procedures, the parties, to date, have been unable to resolve the primary issue in this adversary proceeding – whether the goods sold by the Plaintiffs to the Debtors constitute property of the estate subject to sale by the Debtors.

The court held a status conference on April 14, 2015, to discuss intervention by third parties, among other things.  That same day, the court entered a Scheduling Order in both the adversary proceeding [Adv. Dkt. No. 21] and the Debtors' underlying bankruptcy cases [Dkt. No. 591].  The Scheduling Order, which was served on the matrix, established a deadline by which any proposed intervenor must file a motion to intervene.

On or before the deadline, numerous consignment vendors, as well as the Lenders and the Committee, filed motions to intervene [Adv. Dkt. Nos. 12, 25, 29, 30, 34] pursuant to Fed. R. Bankr. P. 7024 (incorporating Fed. R. Civ. P. 24).  None of the motions, other than the Motion to Intervene filed by the Committee, drew an objection.

In its Motion to Intervene, the Committee seeks to intervene both as a matter of right and permissively.  The Committee's request is understandable, particularly in light of the value of the consignment inventory, as well as the requests to intervene filed by all other major parties in the Debtors' bankruptcy cases.  According to the Committee, it is entitled to intervene as a matter of right because, among other things, (i) it has a substantial legal interest in the adversary proceeding that will be impaired absent intervention, and (ii) the defendants in the adversary proceeding (*i.e.*,

the Debtors and potentially the Lenders) do not adequately represent the interests of unsecured creditors.[5]

Alternatively, the Committee requests the court exercise its discretion and permit the Committee to intervene because the Committee's involvement would not alter any claims or defenses asserted by the Plaintiffs or the Debtors, respectively.  Moreover, the Committee submits that no prejudice or undue delay to the existing parties would occur by permitting it to intervene.

The Plaintiffs filed a lengthy objection [Adv. Dkt. No. 43] (the "Objection") to the Motion to Intervene.  The Plaintiffs contend that the Committee cannot intervene as a matter of right because (i) the Committee has no direct or substantial interest that would be impaired, and (ii) even if the Committee and its constituency have interests that could be impaired, those interests are adequately protected by the Debtors.  The Plaintiffs similarly object to any permissive intervention by the Committee because (i) its claims and defenses are simply derivative of the Debtors' claims and defenses, (ii) intervention would lead to duplicative costs not only to the estates, but also to the Plaintiffs, and (iii) intervention would delay, or perhaps even prejudice, the rights of the existing parties to the adversary proceeding.

The court conducted a hearing regarding the Motion to Intervene on April 29, 2015, after which the court decided to take the matter under advisement.  None of the Plaintiffs or the Committee sought to admit any documents into evidence or to elicit any testimony in support of their respective positions.  After careful consideration of the Motion to Intervene, the Objection,

---

[5]      The court has entered orders granting the motions to intervene filed by FC Special Funding and Credit Suisse, subject to certain conditions.  *See In re Adelphia Communications Corp. v. Rigas (In re Adelphia Communications Corp.)*, 285 B.R. 848, 857-58 (Bankr. S.D.N.Y. 2002) (granting request to intervene subject to certain conditions and restrictions to ensure efficiency and lack of prejudice).

and the arguments made at the hearing, the court concludes that the Committee has neither established a right to intervene nor demonstrated that permissive intervention is warranted.

## DISCUSSION

A.    *Intervention as of Right Under Fed. R. Civ. P. 24(a)*

The Committee first requests intervention as a matter of right under Fed. R. Civ. P. 24. Rule 24 provides that upon a timely motion, the court must permit intervention by a party who:

> (1)    is given an unconditional right to intervene by federal statute; or
>
> (2)    claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, *unless existing parties adequately represent that interest*.

Fed. R. Civ. P. 24(a) (emphasis added).[6]

The Sixth Circuit Court of Appeals has identified the following four elements, each of which must be satisfied before a party will be permitted to intervene as a matter of right:  (i) timeliness of the motion to intervene, (ii) the movant's substantial legal interest, (iii) the impairment of the movant's ability to protect that interest in the absence of intervention, and (iv) inadequate representation of that interest by the existing parties.  *Harker v. Troutman (In re Troutman Enterprises, Inc.)*, 286 F.3d 359, 363 (6th Cir. 2002); *Stupak-Thrall v. Glickman*, 226 F.3d 467, 471 (6th Cir. 2000) (citations omitted).  The party seeking to intervene has the burden of demonstrating each element by a preponderance of the evidence.  *Id*. (citing *Grubbs v. Norris*, 870 F.2d 343, 345 (6th Cir. 1989)).

---

[6]    The Committee has not asserted that a federal statute grants it an unconditional right to intervene pursuant to Fed. R. Civ. P. 24(a)(1).  *See* 11 U.S.C. § 1109(b).  Therefore, the court need not consider this issue and makes no determination in this regard.  *Compare*, *e.g.*, *Phar-Mor, Inc. v. Coopers & Lybrand*, 22 F.3d 1228 (3d Cir. 1994) (interpreting reference to "case" in section 1109(b) as applying to adversary proceeding) *with Fuel Oil Supply and Terminaling v. Gulf Oil Corp.*, 762 F.2d 1283, 1285-87 (5th Cir. 1985) (Fed. R. Bankr. P. 2018, applicable to cases, and not Fed. R. Bankr. P. 7024, applicable to adversary proceedings, implements section 1109); *see also* 11 U.S.C. § 307 (right to be heard on any issue "in any case or proceeding"); 11 U.S.C. § 1109(b) (right to be heard on any issue "in a case").

*1.      Timeliness of the Motion to Intervene*

At the hearing, the Plaintiffs acknowledged that the Motion to Intervene was filed in accordance with the Scheduling Order and was therefore timely.  As such, the Committee has satisfied the first element for intervention as of right.

*2.      Substantial Legal Interest*

The court next considers whether the Committee has a substantial legal interest in the adversary proceeding.  The Committee must only demonstrate that it has a "significantly protectable interest," meaning one that is "direct and substantial." *Meyer Goldberg, Inc. of Lorain v. Goldberg*, 717 F.2d 290, 292 (6th Cir. 1983) (quoting *Donaldson v. United States*, 400 U.S. 517, 532 (1971); *Brewer v. Republic Steel Corp.*, 513 F.2d 1222, 1223 (6th Cir. 1975)).  Although Fed. R. Civ. P. 24(a) should be broadly construed in favor of the proposed intervenor, the intervenor must nevertheless demonstrate a significantly protectable interest, or at least the potential for one under the circumstances in any given case.  The bar is not high, however. *See Grutter v. Bollinger*, 188 F.3d 394, 399 (6th Cir. 1999).

In its Objection and at the hearing, the Plaintiffs devoted limited argument to this element, contending somewhat generically that the Committee has no interest in property, especially because the Committee seeks to protect contingent claims of unsecured creditors.  As support the Plaintiffs cite to a recent decision from the Sixth Circuit Court of Appeals where the court discussed the distinction between a legally protectable interest and a contingent interest. *See Reliastar Life Ins. Co. v. MKP Investments*, 565 Fed. Appx. 369, 373 (6th Cir. 2014); *but see also Triax Co. v. TRW, Inc.*, 724 F.2d 1224, 1227 (6th Cir. 1984) (affirming trial court's holding that contingent interest satisfied requisite element for intervention as of right).  In *Reliastar* the Sixth Circuit ultimately stated that it was unnecessary to decide whether a legally protectable interest

existed because the proposed intervenor's interests were adequately represented by an existing party. *Id*. While the discussion of this element in *Reliastar* is helpful, it is not determinative.

Moreover, even if *Reliastar* does to some extent discount contingent interests, the Sixth Circuit in *Reliastar* did not consider intervention by a committee in the context of a bankruptcy adversary proceeding. In an earlier decision that remains good law, the Sixth Circuit held that a creditor seeking to intervene in a private antitrust action prosecuted by a bankruptcy trustee did possess a direct substantial interest so as to give rise to intervention as a right. *Meyer Goldberg*, , 717 F.2d at 293. This court finds the Committee's interest in this adversary proceeding on behalf of unsecured creditors to be analogous to that of the creditor in *Meyer Goldberg*, which this court views as highly persuasive, if not controlling, authority.

Finally, the Sixth Circuit has instructed courts to employ an "expansive notion of the interest sufficient to invoke intervention of right." *Mich. State AFL-CIO v. Miller*, 103 F.3d 1240, 1245 (6th Cir. 1997) (collecting cases). The Committee, while itself not typically a claimholder, is indisputably a representative for an entire constituency of claimholders that could receive a direct benefit in the event that the consignment inventory is deemed to be property of the estate. As such, the Committee, on behalf of its constituents, holds a pecuniary interest in the adversary proceeding. *See Munford, Inc. v. TOC Retail, Inc. (In re Munford, Inc.)*, 115 B.R. 388, 389 (Bankr. N.D. Ga. 1990) (finding committee had actual and direct interest because unsecured creditors held $43 million in claims). To hold otherwise would frustrate one of the fundamental purposes of the Committee, protector of, and advocate for, unsecured creditors. *See, e.g.*, *In re Residential Capital, LLC*, 480 B.R. 550, 559 (Bankr. S.D.N.Y. 2012). While it is quite possible that the Debtors' estates are administratively insolvent, thereby resulting in little, if any, distribution to general unsecured creditors, the Committee nevertheless retains an interest in the adversary proceeding on

behalf of unsecured creditors. The outcome of this adversary proceeding and potentially others, together with the proceeds from any sale of the Debtors' assets, could incrementally increase the distribution to unsecured creditors. *See also Matter of Chalk Line Mfg., Inc.*, 184 B.R. 828, 832 (Bankr. N.D. Ala. 1995) (recognizing interest of committee due to distribution to unsecured creditors but also noting interest could be illusory because majority of any distribution would be to largest *unsecured* creditor). In light of the Sixth Circuit's liberal view of a requisite legal interest, this court concludes that the Committee has satisfied the second element to intervene as a right.

### 3. Ability to Protect Against Impairment

The court next considers whether the Committee has the ability to protect its interest from impairment absent intervention in this adversary proceeding. In its Motion to Intervene, the Committee states that a proposed intervenor need only demonstrate that impairment is possible. However, as emphasized by the Plaintiffs at the hearing, the analysis requires more than possible impairment; it also expressly contemplates that there be insufficient means by which to protect against such impairment.

In this adversary proceeding, the Committee clearly has an adequate opportunity to protect its interests without intervention. First, on a most basic level, the Committee always has the ability to monitor this adversary proceeding (as well as any others) to ensure that its rights are not being compromised in any way. *See also In re 8309 Talbot Place Corp.*, 27 F.Supp. 40, 41 (E.D.N.Y. 1939) (denying committee's motion to intervene but ordering notice be given to committee in case under Bankruptcy Act). At the hearing, the Committee acknowledged that it has a rather transparent relationship with the Debtors, who have apparently been forthcoming with documents and other information requested by the Committee. The court was also left with the impression

that the Debtors and the Committee communicate on a fairly routine basis regarding various issues, including, presumably, the alleged rights of the consignment vendors and the impact thereof on the sale process and the Debtors' estates in general. There is no reason to believe that the Committee will not have the same opportunities with respect to this adversary proceeding, and the Committee has not argued otherwise.

Second, in the event that the Debtors seek to resolve the adversary proceeding, any compromise would need to be subject to the notice and hearing requirement of Fed. R. Bankr. P. 9019. At that point in time, the Committee would have an opportunity to object to any proposed compromise, engage in discovery, and directly participate in an evidentiary hearing to determine if the settlement is fair and equitable. *See Meyer Goldberg*, 717 F.2d at 294 (affirming lower court's denial of permissive intervention because proposed intervenor could object to any compromise in underlying bankruptcy case).

Third, as recognized by other courts, nothing precludes a party from seeking leave to file an amicus brief. *See*, *e.g.*, *Bradley v. Milliken*, 828 F.2d 1186, 1194 (6th Cir. 1987) (affirming denial of intervention because, in part, intervenors' interests protected through amicus opportunity); *Simetco, Inc. v. Amsouth Bank, N.A. (In re Amsouth Bank, N.A.)*, 1994 WL 470490 (Bankr. N.D. Ohio Aug. 15, 1994). While it would be premature to grant the Committee leave to file an amicus, the court is preliminarily receptive to such a request in the future.

Fourth, in the event that the Committee uncovers evidence that defenses are somehow being impaired or claims of the estate not being pursued, the Committee may always seek derivative standing or even the drastic measure of requesting the appointment of a trustee. *See Canadian Pacific Forest Products Ltd. v. J.D. Irving, Ltd. (In re The Gibson Group, Inc.)*, 66 F.3d

1436, 1446 (6th Cir. 1995) (citing *In re Automated Business Systems, Inc.*, 642 F.2d 200 (6th Cir. 1995); *Matter of Xonics Photochemical, Inc.*, 841 F.2d 198 (7th Cir. 1988)).

Fifth, as part of its Scheduling Order, the court required existing parties to the adversary proceeding, as well those seeking to intervene, to file a statement indicating whether they would voluntarily participate in facilitative mediation.[7]  All of the parties, with the exception of a certain group of proposed intervenor-consignment vendors, consented to mediation on a fairly expedited basis.  None of the parties have expressed concerns with the Committee's participation in the mediation process.  As such, the Committee will be directly involved in any mediation so as to represent the interests of the unsecured creditors during settlement discussions.

In sum, the court concludes that the Committee has an ability to protect its interests outside of this adversary proceeding and, therefore, intervention is not warranted.[8]

### 4.   *Inadequate Representation by Existing Parties*

The court last considers whether existing parties, and the Debtors in particular, are adequately representing the interests of the Committee and unsecured creditors.[9]  A party seeking to intervene as a matter of right bears the burden of proving that it is inadequately represented by a party to the litigation.  *United States v. Mich.*, 424 F.3d 438, 443 (6th Cir. 2005).  "Although it is true that a proposed intervenor must show only 'that there is a potential for inadequate representation,' . . . a presumption of adequate representation arises when a putative intervenor

---

[7]    Because any sale of substantially all of the Debtors' assets is scheduled to occur in approximately one month (assuming identification of a purchaser and satisfaction of the requisite legal standards), it is unlikely that this court will be able to fully adjudicate the issues in this adversary proceeding prior to the sale hearing.

[8]    The court reaches this conclusion based on the specific facts of this adversary proceeding.  The court's conclusion should not be interpreted as a *per se* rule.  Under different circumstances, the presence of the aforementioned protections may not be sufficient.

[9]    Although the Committee has failed to demonstrate it suffers from an inability to protect against impairment, the court feels compelled to at least briefly address this last element, which was the primary issue in the parties' briefs and during oral argument.

'share[s] the same ultimate objective as a party to the suit.'" *Reliastar*, 565 Fed. Appx. at 373 (quoting *Mich.*, 424 F.3d at 444). According to the Sixth Circuit, a party seeking to intervene fails to satisfy such burden if it cannot demonstrate (i) collusion between the representatives and an opposing party, (ii) pursuit by the representative of an interest adverse to that of the proposed intervenor, or (iii) a representative's failure to fulfill his duty. *Id.* (citations omitted); *see Kowal v. Malkemus (In re Thompson)*, 965 F.2d 1136, 1143 (1st Cir. 1992) ("concrete facts" required).

The Committee argues that previous actions of the Debtors should give rise to an inference that the Debtors will not adequately represent the interests of unsecured creditors. First, the Committee points to a form asset purchase agreement prepared by the Debtors that purports to suggest the Debtors do not believe the consignment inventory is property of the estate. The court is confused. The form agreement was simply that – a template available as a starting point for potential purchasers to present a bid for all or a portion of the Debtors' assets. At the hearing on the bidding procedures, all parties, including the Committee, were in agreement that the provisions within the form document were fully negotiable, and thus in no way a requirement to be imposed on potential purchasers, or binding on the Debtors for that matter. Moreover, the Committee has not introduced any evidence other than the form agreement itself that would support this allegation. The court thus finds this argument unpersuasive.

The Committee next argues that the Debtors and the Committee are not necessarily aligned with respect to the interests of FC Special Funding, which filed its own motion to intervene. This argument has more traction, especially in light of the insider (or at least affiliated) nature of the relationship between the Debtors and FC Special Funding. In its motion, FC Special Funding sought to intervene not only to assert that the consignment inventory is property of the estate, but also to obtain a declaration that FC Special Funding has a valid, first priority security interest in

the consignment inventory.[10]  Although asserted against the Plaintiffs (and not the Debtors), FC

Special Funding's declaratory request, as the Committee notes, could be perceived as an attempt

to circumvent any challenge that the Committee might make to FC Special Funding's security

interest.[11]  The Committee negotiated with FC Special Funding for such right in connection with

the stipulated cash collateral order [Dkt. No. 593].  At the hearing on the Motion to Intervene, the

court expressed concern with the proposed intervention of FC Special Funding and Credit Suisse

for this very reason.  In response, both Lenders modified their requests to intervene by seeking to

intervene solely as defendants in this adversary proceeding, thereby disposing of their requests for

a declaration related to their security interests.[12]

Relatedly, the Committee also argues that the "connections" between the Debtors and FC

Special Funding could "create aligned interests" to the detriment of the Committee and any

challenge to the security interest of FC Special Funding.  While the court is mindful of the

relationship between FC Special Funding and the Debtors, the Committee has not presented any

evidence demonstrating collusion, an adverse interest, or that the Debtors will be unable to fulfill

their duties to their estates in connection with this adversary proceeding.  To the contrary, the

---

[10]     Credit Suisse filed a motion to intervene with a similar request for declaratory relief.  The Committee's concerns would also seem to apply to Credit Suisse.

[11]     At the hearing, the court questioned whether it would have subject matter jurisdiction to decide whether the Lenders hold valid secured claims *against the Plaintiffs* as opposed to the Debtors and the property of their estates. The court was particularly concerned due to FC Special Funding's motion requesting relief from the automatic stay and, importantly, abandonment of any interest by the Debtors in their property, including, presumably, the consignment inventory [Dkt. No. 634].  However, in light of the modifications made by the Lenders at the hearing, the court need not further consider this jurisdictional issue.

[12]     Absent such modifications, the court's decision with respect to the Motion to Intervene may have been different.  For example, the court may have, among other things, denied the Lenders' motions to intervene, further restricted the involvement of the Lenders in this adversary proceeding, or perhaps even granted the Motion to Intervene.  If the Lenders had pressed their request for declaratory relief as part of this adversary proceeding, the Committee's interest would, in all likelihood, not be adequately represented and its ability to protect against impairment severely diminished, as the Debtors relinquished their right to contest the validity or priority of the Lenders' security interests in the cash collateral order.

Committee has repeatedly stated at various hearings that, to date, it has no reason to believe that the Debtors are not fully satisfying their fiduciary duties.

Based on the record before the court, the Committee has not rebutted the presumption that the Debtors, who seek to maximize the return for their estates' stakeholders, will not sufficiently represent the interests of the Committee and the unsecured creditors. The court therefore finds that the Committee is not entitled to intervene as of right.

B.    *Permissive Intervention Under Fed. R. Civ. P. 24(b)*

As an alternative basis for intervention, the Committee relies on Fed. R. Civ. P. 24(b), which provides that on a timely motion, the court may permit anyone to intervene who:

> (A)    is given a conditional right to intervene by a federal statute; or
>
> (B)    has a claim or defense that shares with the main action a common question of law or fact.

Fed. R. Civ. P. 24(b)(1).[13] The court is to exercise discretion in applying Fed. R. Civ. P. 24(b)(1) by considering whether intervention will "unduly delay or prejudice" the adjudication of the existing parties' rights. Fed. R. Civ. P. 24(b)(3).

According to the Sixth Circuit, a party seeking permissive intervention must first establish that its motion is timely and asserts at least one common question of fact or law. *United States v. Mich.*, 424 F.3d at 445 (citation omitted). Upon such a showing, the court is required to consider undue delay and prejudice to the existing parties, as well as any other relevant factors. *Id*.

This court is persuaded by the rationale of other courts in the Sixth Circuit that have denied requests by committees seeking to permissively intervene in adversary proceedings. *CVC, Inc. v. Conway, Patton & Bouhall (In re CVC, Inc.)*, 106 B.R. 478, 480 (Bankr. N.D. Ohio 1989) (denying

---

[13]    The Committee has not asserted that a federal statute grants it a conditional right to intervene pursuant to Fed. R. Civ. P. 24(b)(1)(A).

permissive intervention due to, among other things, increased costs and ability to monitor); *Pioneer Investment Services Co. v. Valley Fidelity Bank & Trust Co. (In re Pioneer Investment Services Co.)*, 106 B.R. 507, 510 n.5 (Bankr. E.D. Tenn. 1989) (denying permissive intervention due to duplication of effort, costs and delays); *Simetco, Inc. v. Amsouth Bank, N.A. (In re Simetco, Inc.)*, 1994 WL 470490 (Bankr. N.D. Ohio Aug. 15, 1994) (noting caution must be exercised to avoid inefficiencies and duplication, particularly where intervenor asserts identical position); *see Meyer Goldberg*, 717 F.2d at 294 (affirming lower court's denial of permissive intervention because proposed intervenor had ability to object to any compromise in underlying bankruptcy case).

In the instant adversary proceeding, the court finds the Motion to Intervene is unquestionably timely and asserts at least one common question of fact or law. However, the court also finds that intervention by the Committee would result in prejudice and perhaps undue delay. First, the Committee seeks to assert the same defenses that will be raised by the Debtors. Any actions undertaken by the Committee in this adversary proceeding would therefore be duplicative of the Debtors, who are already representing the interests of their estates and creditors, presumably in compliance with their fiduciary duties. This court therefore believes that the Committee's participation would accomplish little more than increased and unnecessary administrative expenses.

Second, it is possible that the Committee's direct participation in this adversary proceeding would prejudice the existing parties, and the Plaintiffs in particular. As the Plaintiffs suggest in their Objection, they would likely be forced to incur additional costs by having to respond to pleadings and discovery requests from the Debtors and the Committee, all of whom share the same defenses (and potentially, causes of action) on behalf of the Debtors' estates, as discussed above.

In addition, the involvement of the Committee might lead to confusion of the parties, especially in light of the overlapping roles of the Committee and the Debtors.

Finally, although the Committee suggests that it would make every effort to avoid duplication and minimize its role in order to reduce costs, as a party to the adversary proceeding, the Committee would be charged with direct participation. A party to litigation cannot simply proclaim dormancy or a reduced role. The court therefore declines to exercise its discretion to permit the Committee to intervene in this adversary proceeding.

## **CONCLUSION**

For the foregoing reasons, the court denies the Motion to Intervene. The court shall enter a separate order consistent with this Memorandum Decision.

**Signed: May 4, 2015**





John T. Gregg
United States Bankruptcy Judge